IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SWAYZE MCCRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:21-CV-214-KFP |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Swayze McCray filed a Complaint seeking review of the Social Security Administration's decision denying his application for social security disability benefits. Doc. 1. The Court construes McCray's supporting brief (Doc. 19) as a motion for summary judgment and the Commissioner's opposition brief (Doc. 22) as a motion for summary judgment. The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). Docs. 13, 14.

After scrutiny of the record and the motions submitted by the parties, the Court finds that McCray's motion for summary judgment is due to be DENIED, the Commissioner's motion for summary judgment is due to be GRANTED, and the decision of the Commissioner is due to be AFFIRMED.

## I.    STANDARD OF REVIEW

This Court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope is limited to determining whether substantial evidence in the record

as a whole supports the Commissioner's decision and whether the correct legal standards were applied. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Substantial evidence is more than a scintilla but less than a preponderance. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The Court may not reweigh evidence or substitute its judgment for that of the Commissioner, and, even if the evidence preponderates against the Commissioner's factual findings, the Court must affirm if the decision is supported by substantial evidence. *Winschel*, 631 F.3d at 1178; *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

## II.    PROCEDURAL BACKGROUND

McCray protectively filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act in July 2016, alleging a disability onset date of February 8, 2016. After his application was denied initially, he had a hearing before an administrative law judge. In March 2018, the ALJ issued a decision finding McCray not disabled. He requested administrative review of the ALJ's decision, which the Appeals Council denied. He then filed a civil action in this Court and, while that appeal was pending, filed a new Title II application on July 5, 2018. The new application was denied initially and then assigned to a different ALJ, who held a hearing on July 25, 2019. Before the ALJ issued a decision on the new claim, this Court remanded the first claim because the ALJ failed to give "great weight" to the Veterans Affairs (VA) disability determination and because the ALJ did not demonstrate that she seriously considered and closely scrutinized the VA determination. R. 1465–71.

On remand, the Appeals Council vacated the March 2018 ALJ decision on the first claim, remanded the case to the ALJ on McCray's new claim, and ordered the ALJ to consolidate the two claims, associate the evidence, and issue a new decision on the consolidated claims, applying the prior rules to the consolidated case pursuant to HALLEX I-5-3-30. R. 1457. The ALJ conducted a hearing on the consolidated claims and issued a decision on November 9, 2020, finding McCray not disabled.

## III.   FACTUAL BACKGROUND

McCray's date of birth is October 18, 1969, making him fifty-one years old on the date of the ALJ's decision. R. 143, 1400. He completed high school and about three years of college, and he has past work experience as an infantryman, store laborer, and forklift operator. R. 31–32, 44, 222–29.

The ALJ found that McCray had severe impairments of hypertensive heart disease with acute combined congestive systolic and diastolic heart failure status-post myocardial infarction/coronary artery disease; cardiomegaly; obesity; degenerative joint disease of the bilateral knees; degenerative joint disease of the right ankle; pes planus bilaterally without hallux valgus deformity or significant degenerative change; calcaneal spur of the right foot; degenerative disc disease of the lumbar spine; right elbow ulnar focal neuropathy (cubital tunnel syndrome); post-traumatic stress disorder (PTSD); adjustment disorder with mixed anxiety and depressed mood; adjustment disorder, not otherwise specified; anxiety disorder; and depression. R. 1406. However, she determined that he did not have an impairment or combination of impairments that meets or medically equals the severity of

one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (2020). R.

1408–1411.

Next, she assessed McCray's residual functional capacity and found that he could

perform light work with the following additional limitations:

> [C]laimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently. He can stand, walk, and sit for 6 hours each in an 8-hour day except that he must be allowed to alternate between sitting and standing at the work station while completing the task at hand twice per hour for up to 5 minutes each time. Claimant can never operate foot controls. He can never kneel, crawl, or climb ladders, ropes, or scaffolds. He [can] occasionally climb ramps and stairs, stoop, and crouch. Claimant occasionally can reach overhead. He occasionally can be exposed to extreme cold, extreme heat, vibration, wetness, and humidity. He must avoid concentrated exposure to environmental irritants such as odors, dust, gases, and fumes. Claimant can never be exposed to dangerous chemicals; unprotected heights; or open, moving, mechanical parts and hazardous machinery. He can never operate a motorized vehicle. Claimant can concentrate sufficiently in 2-hour increments to apply a commonsense understanding to carry out detailed, but uninvolved, written and oral instructions, and deal with problems involving a few concrete variables from standardized situations. Claimant cannot perform work at a production pace such as assembly line work. He can make simple work related decisions. He occasionally can interact with supervisors. He occasionally can interact with coworkers, but never in a tandem or team setting. Claimant occasionally can interact with the public superficially. He can work in a setting with fixed and predictable tasks.

R. 1411. She then found McCray could not perform his past relevant work. R. 1419.

However, with the benefit of vocational expert testimony and based on McCray's RFC,

age, education, and work experience, she found there were jobs existing in significant

numbers in the national economy that he can perform, such as garment folder, sorter I, and

checker I. R. 1420–21. Therefore, she found McCray not disabled. R. 1421.

## IV.   DISCUSSION

On appeal, McCray asserts three issues: (1) the ALJ failed to properly evaluate the disability determination from the Department of Veterans Affairs; (2) the ALJ failed to properly evaluate and develop the medical records in determining McCray's RFC; and (3) the ALJ failed to properly evaluate the subjective statements of McCray and his wife. Doc. 19 at 3.

### A.   Disability Determination by the Department of Veterans Affairs

In September 2016, the Department of Veterans Affairs found McCray 100% totally and permanently disabled as of August 30, 2016. R. 942–54. The disability rating was based on the combined effect of several service-related disabilities, including PTSD (adjustment disorder with anxiety and depressed mood), evaluated at 70% disabling; congestive heart failure, hypertensive heart disease, atrial septal defect, old myocardial infarction, and stable angina, evaluated at 60% disabling; obstructive sleep apnea, evaluated at 50% disabling; pes planus/bilateral feet, evaluated at 50% disabling; and other conditions evaluated at lesser disability ratings.  R. 941–954.

McCray argues the VA's rating was entitled to "great weight" under Eleventh Circuit case law and this Court's previous order remanding his first social security appeal. However, after that remand order was entered, the Eleventh Circuit decided *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317 (11th Cir. 2020) in an effort to "reconcile seemingly fractured precedent regarding the weight an ALJ must afford [another agency's] decision." *Id*. at 1325. After examining prior precedent and the context in which the "great weight" standard was applied, the Eleventh Circuit held that requiring an ALJ to *consider and*

*discuss* another agency's decision is consistent with giving it "'great weight' because it requires an ALJ to give a special type of consideration to such evidence" when there is "no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Noble*, 963 F.3d at 1329 (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)). The Eleventh Circuit concluded that its precedent directs a court to ask two questions when determining whether an ALJ properly considered another agency's finding of disability:

> First, the court must ask whether the ALJ's decision shows that she considered the other agency's decision. If the ALJ's decision does not discuss the other agency's decision, the case must be remanded to the Commissioner for consideration of the other agency's decision. But if the ALJ discussed the other agency's decision, the court moves on to the second step of the analysis: whether substantial evidence in the record supports the ALJ's decision to depart from the other agency's decision. If there is substantial evidence in the record, then the ALJ's decision should be affirmed.

*Noble*, 963 F.3d at 1330 (internal citations omitted); *see also Maldonado v. Comm'r of Soc. Sec.*, 861 F. App'x 402, 404–05 (11th Cir. 2021); *Mills v. Berryhill*, 824 F. App'x 894, 898 (11th Cir. 2020). Accordingly, *Noble* forecloses McCray's "great weight" argument. Instead, the Court must determine whether the ALJ considered the VA's decision. If she did not discuss it, remand is required. If she did discuss it, the Court must determine whether substantial evidence supports her decision to depart from the VA's decision. If so, the Court must affirm.

**1.   ALJ's Discussion of VA's Decision**

Here, there is no question that the ALJ considered the VA's decision, as she acknowledged the decision and then devoted three paragraphs to a discussion of its details and an explanation of how the medical evidence did not support a conclusion that McCray

was precluded from performing all work. R. 1417–18. Because the Court finds that the ALJ discussed the VA's opinion, it must next determine whether substantial evidence supports her decision to depart from it.

### 2.    Substantial Evidence Supports the ALJ's Decision to Deviate

In her decision, the ALJ specifically stated that she assigned the VA's ratings "limited weight" because they "do not express any specific functional limitations in relation to his rated impairments," the VA did not find McCray unemployable under its own regulations, and the VA denied him caregiver support benefits. R. 1417. Further, based on her review of McCray's complaints, medical records, treatment, consultative examinations, and the VA's compensation and pension evaluation, she could not conclude that he was precluded from performing all work. *Id*.

In reaching this conclusion, the ALJ noted that McCray's mental status findings were "predominantly benign" and his physical findings "have not regularly documented abnormal gait or significantly reduced strength, range of motion, or sensation." *Id*. She also pointed out that, aside from arthroscopic surgery on the right ankle, no surgery has been recommended for any musculoskeletal complaints, and he reported engaging in activities like grocery shopping, playing dominoes, and going to the gym. *Id*. at 1417–1418; 1671. Additionally, only six months before his hearing with the ALJ, McCray told his primary care provider he was looking for work in a supervisory capacity. *Id*. at 1418, 1774.

As the ALJ further noted, the VA's three highest-rated impairments were for PTSD (70%), heart conditions (60%), and obstructive sleep apnea (50%). R. 1418. The VA also rated his pes planus (bilateral foot) at a 50% disability. R. 943. With respect to his PTSD,

although McCray received some treatment from mental health professionals during the relevant time period, he did not participate in counseling or therapy throughout the time period at issue, he reported benefit from the counseling and therapy he did receive, and he reported benefit from his medications. R. 1418. With respect to his physical conditions, the ALJ noted that he had undergone arthroscopy on his right ankle in July 2015[1] and cataract extraction/lens replacement in both eyes but that he required only conservative treatment for the lesser-rated VA impairments. *Id*. Finally, although McCray reported a myocardial infarction in November 2016, his treatment consisted only of medication management and monitoring. *Id*.

### a.   Medical Records Regarding Mental Health

Additionally, McCray saw Dr. Gam in January 2017 and Dr. Stewart in September 2018 for psychological consultative examinations. When McCray saw Dr. Gam, he had already received a 70% disability rating for PTSD from the VA but reported that he had never been treated by a psychologist or psychiatrist up until that point. R. 937. He reported that he awoke at 6:00 a.m. and would go to bed around 2:00 a.m. *Id*. Although he stated that he did not drive or visit friends, he watched TV, went fishing, played dominoes with his friends, and could pay bills and grocery shop. R. 938. Upon examination, Dr. Gam

---

[1] McCray's medical records indicate that he first injured his right ankle in 1996 playing football and reinjured it in 2011 while deployed. On July 20, 2015, a week before his surgery, he rated his ankle pain as 2/10 (mild). R. 786. Also, his exercise level was reported as "moderate" before surgery, and he was "[i]ndependent in all activities." R. 787. He reported that he could drive. *Id*. On September 15, 2015, at a follow-up appointment after surgery, he rated his pain level at 2-3/10 and reported he was "recovering 'very well.'" R. 769. He returned to the doctor on October 15, 2015, only for a follow-up on his blood pressure medication, and he stated that he was not having any other problems at that time. R. 761. His pain level was a 0/10. R. 762.

found he was alert and oriented to time, place, person, and situation, and his thought process was orderly. *Id*. McCray's thought content was centered around his inability to work due to his *physical* problems. *Id*. No motor deficits were noted, and Dr. Gam found no indications of psychotic symptoms. *Id*. at 938–39. His affect was somewhat constricted and his mood subdued, but his intellect was intact, his knowledge of current events was fair, and he had a fair grasp of current world events. His recent memory, concentration, and attention span were impaired, but his ability to perform simple calculations was fair. *Id*. at 939. He could count backwards from 100 and perform serial 3 additions and serial 7 subtractions. *Id*. His ability for abstraction was adequate. *Id*. His rote insight and judgment were conventional, and his fluid judgment was fair. *Id*.

Dr. Gam opined that McCray had a moderate impairment in his ability to respond appropriately to supervision, coworkers, and work pressures; maintain concentration and pace for more than two hours; adapt to change at work; manage his activities of daily living; and function socially. *Id*. at 940. However, he had no impairment in his ability to comprehend, carry out, and remember simple instructions and make simple work decisions. *Id*. Again, even following the PTSD rating, Dr. Gam documented McCray's own statement that his "main problem is physical disability" and noted that McCray had continued to work until he suffered his heart attack. *Id*. Dr. Gam wrote that he "presents some psychiatric disturbances" that "should respond to treatment," but he concluded that the "validity of his claim of disability has to be contingent primarily on the extent of his physical disability as determined by a medical examiner." *Id*.

Dr. Stewart's findings from September 2018 are similar. He concluded McCray could understand basic directions, had some limitations with interpersonal skills required to relate to others in a work setting, and had difficulty handling day-to-day work pressures, but he was able to sustain attention needed to do repetitive tasks. R. 2090. The ALJ gave the opinions of Dr. Gam and Dr. Stewart great weight because they were consistent with the overall medical evidence and with each other.[2] R. 1418–19. These opinions constitute substantial evidence supporting the ALJ's conclusions as to McCray's mental conditions.

### b.   Medical Records Regarding Physical Condition

With respect to McCray's physical conditions, his medical records are predominantly unremarkable. As the ALJ noted, the records document diagnoses of chondromalacia patella of the bilateral knees, bilateral primary osteoarthrosis of the bilateral knees, bilateral pes planus, calcaneal spur of the right foot, right elbow ulnar focal neuropathy, hypertensive heart disease with acute combined congestive systolic and diastolic heart failure status-post myocardial infarction/CAD, and obesity. R. 1413. However, despite these conditions, McCray goes fishing, plays dominoes, goes grocery shopping, and goes to the gym three or four times a week. He further reported that he can walk a half a mile, carry 25 pounds in one hand, lift 50 pounds overhead, and he exercises 30 minutes a day, including performing dumbbell exercises that were a change from his

---

[2] Additionally, in treatment records from Solace Expressions LLC from January and February 2018, his therapist wrote that he "reported doing well and processed recent participation in social events along with how his insight has changed regarding his ability to cope with social anxiety." R. 1669–1680, 1678. McCray reported "increased ability to express feelings without resorting to anger" and "ongoing success with participating in social activities and being receptive to meeting new people." R. 1680.

normal 25 pounds. *See* R. 937, 938, 1413, 1671–76, 1676, 1974, 1978. McCray's wife also reported that he performed "light exercise" on an exercise bike. R. 214.

Further, as the ALJ mentioned, although McCray had arthroscopic surgery on his right ankle in July 2015, no further surgery has been recommended for any of his physical ailments. R. 1414, 3F/381.  In July 2017, McCray presented with right ankle pain, but he ambulated without assistance with a steady and upright gait. R. 1804–05. Treatment records from September 2018 by Dr. Carl Foster, a consultative examiner, show that he had a normal gait; no peripheral edema; normal sensation, range of motion, and grip strength; the ability to squat and rise without assistance; normal fine motor skills; and the ability to form a fist and do thumb/finger opposition movements with both hands. R. 1414, 2082–86. When he presented again in February 2020 for right ankle pain, it was noted that the last x-ray showed a bone spur. R. 1774. At this visit, he mentioned receiving a 100% VA rating and said he was "filing for SSDI" and was in "dire financial straits." R. 1774.

Concerning his heart condition, the ALJ noted that McCray had a myocardial infarction in November 2016, and a December 2017 EKG showed evidence of a prior infarction. R. 1413. McCray reported chest pain in April 2017, but his cardiologist determined it was non-cardiac in nature. When he reported chest pain again in July 2019, his cardiologist concluded it was musculoskeletal in nature. In August 2019 McCray told his primary physician that an episode of syncope caused him to have a motor vehicle accident, but a stress test showed no ischemia and monitoring revealed no abnormalities. R. 1414, 1685. McCray's medical records reflect that his heart condition is well controlled with medication, and McCray has pointed to no evidence indicating otherwise. R. 1418,

1684–85 (most recent medical record from cardiologist noting normal stress test, likelihood of pain being musculoskeletal in nature, and treatment consisting only of medication), 1863, 1873, 1989.

### c.    Medical Opinion Evidence About Physical Condition

The ALJ also discussed two medical opinions regarding McCray's physical conditions. In January 2017, a state agency medical consultant limited McCray to light work (R. 60–63), but the ALJ found he was "somewhat more limited" because he can never operate foot controls and requires alternating between standing and sitting. In July 2018 McCray was seen by a state agency medical consultant who limited him to medium work (R. 1500–15), but the ALJ determined that more extensive exertional, postural, and environmental limitations were warranted in the RFC. R. 1417. McCray's reported activities, his medical records, and these opinions, all of which are consistent with each other, constitute substantial evidence supporting the ALJ's conclusions as to McCray's physical conditions.

Accordingly, for the reasons described above, the Court finds that the ALJ considered and discussed the VA's opinion and that substantial evidence supports the decision to depart from the VA's disability determination.

### B.    The RFC

McCray next claims the ALJ failed to properly evaluate and develop the medical records when determining McCray's RFC. First, he argues that Dr. Michael Berger, a psychologist at the VA, should have been given "treating physician" status. Second, he contends it was error to reject Dr. Berger's opinion on the basis that he provided no support

for it. Third, he claims it is unclear how the ALJ could articulate McCray's physical RFC in light of the weight she assigned to the state agency consultants' opinions.

### 1.   Dr. Berger's Treating Physician Status

McCray argues that the ALJ should have given Dr. Berger treating physician status because that would require the ALJ to assign the opinion "substantial or considerable weight unless good cause is shown to the contrary." Doc. 19 at 7. However, the record reflects that Dr. Berger saw McCray only once for the purpose of completing a PTSD disability benefits questionnaire. R. 1380–88. McCray claims Dr. Berger was part of a "treatment team," but there is no evidence of this in the record. The mere fact that Dr. Berger may work for the same facility as one or more of McCray's doctors does not make him part of a treatment team, and Plaintiff provides no legal support holding otherwise.

He relies in part on *Sharon M. v. Comm'r of Soc. Sec.*, No. 1:17-cv-01847-AJB, 2018 WL 4377561 *9 (N.D. Ga. Sept. 13, 2018), but in that case the court said a doctor who is a member of a medical-treatment team may be considered a treating physician when he transmits his own knowledge and opinions and those of the medical-treatment team. Here, although Dr. Berger reviewed McCray's medical file from the VA, there is no evidence his questionnaire response constituted a transmission of the knowledge or opinions of those on a treatment team or that he had any discussions or contact with any of McCray's doctors. Thus, the Court cannot conclude that Dr. Berger was entitled to treating physician status, and McCray's argument fails.

### 2.      Assignment of Little Weight to Dr. Berger's Opinion

McCray's next argument is that the ALJ, who assigned little weight to Dr. Berger's opinion R. 1418), erred by rejecting the opinion on the basis that he provided no support for his opinions. Doc. 19 at 9. The ALJ actually stated that Dr. Berger provided no explanation for checking a box indicating that McCray "would have occupational and social impairment with reduced reliability and productivity." R. 1381,1418. To support this statement, she pointed out that the records do not suggest Dr. Berger had an ongoing treatment relationship with McCray and that McCray's treatment records fail to show abnormal mental status findings that would preclude the performance of work within his assigned limitations in the RFC.[3] *Id*.

The ALJ is correct that Dr. Berger failed to supplement this particular response with a description of symptoms or previous treatment supporting an "occupational and social impairment with reduced reliability and productivity." McCray argues that, in another section of the form, Dr. Berger "*identified evidence* of irritability, suspiciousness, depression, flashbacks, intense or prolonged psychological distress in response to things that reminded Plaintiff of past trauma, avoidance of both thoughts and external reminders of the events, hypervigilance, exaggerated startle response, problems with concentration, and sleep disturbances." Doc. 19 at 9. However, although Dr. Berger's questionnaire seems to catalog McCray's reported *symptoms*, it does not identify *evidence* of these symptoms

---

[3] The box checked by Dr. Berger does not quantify the degree of impairment or reduction in reliability and productivity. The preceding box refers to an "occasional" decrease in work efficiency and intermittent periods of the inability to perform occupational tasks, and the last box, which Dr. Berger did not check, indicates that a condition would cause total occupational impairment. R. 1381.

outside of McCray's own report. Additionally, it does not describe the frequency of these symptoms—only that they occurred for more than one month.[4] R. 1385.

Dr. Berger completed his report in February 2016. R. 1388. In contrast to Dr. Berger's findings, McCray's mental health records do not support an intensity and frequency that would preclude all work. After meeting with Dr. Berger in February 2016, McCray participated in group therapy sessions at the VA. By February 2017, he was taking Paxil and prazoxin with a good response. R. 1057. He reported improvement with hypervigilance and irritability, decreased nightmares, and that he was no longer avoiding sleep or checking locks and windows repeatedly. R. 1054.

When McCray saw Dr. Gam in January 2017, he reported symptoms of depression and irritability, trouble falling asleep, nightmares, being on guard, anhedonia, anergia, and amotivation, but he denied nervousness, panic attacks, worrying, social withdrawal, crying spells, and feelings of hopelessness. R. 937–936. When he saw Dr. Scott Jones in February 2017, he reported a good many of the symptoms listed on the VA report. However, by June 2017, Dr. Jones's progress note stated that McCray was "doing much better" and no longer having nightmares, his anxiety had dissipated, he was not nearly as angry as before, his children had noticed the change in attitude and temperament, and he was answering the phone and talking to friends without anxiety. Dr. Jones also noted that, because McCray was "doing so well," they decided to schedule his "next and possibly last appointment" the following week and, if all went well, treatment would be terminated. R. 1667.

---

[4] In another section of the VA report, Dr. Berger checked a box indicating that McCray suffers from panic attacks that occur more than once a week, but this is the only indication of frequency for any of the reported symptoms. R. 1386. In January 2017 McCray denied panic attacks as one of his symptoms. R. 937–38.

A year later when he participated in therapy at Solace Expressions, LLC in January 2018, he reported symptoms of anger problems, anxiety, mistrust, irritability, isolation, martial tension, decreased sleep, and a decreased appetite. R. 1668–71. At his next appointment, he reported trying to engage in more relaxation and exercise. R. 1674. In February 2018 he reported doing well, going to the gym three–four times a week as a coping skill, recent participation in social events, increased ability to express feelings without resorting to anger, and success with social activities. R. 1676–80.

When he saw Dr. Scott Stewart in September 2018, he reported an "on guard" mood, problems with anxiety and worry, hypervigilance, exaggerated startle response, sleep disruptions, nightmares, and interrupted thoughts, but he denied depression, appetite problems, and suicidal ideations. Despite these symptoms, Dr. Stewart said he would have some limitations with the interpersonal skills required to relate to others in a work setting and some difficulty handling day-to-day pressures of work, but he would be able to sustain the attention needed to do repetitive tasks.[5] R. 2088–90.

Thus, contrary to McCray's argument, the fact that he may have reported the existence of certain symptoms to one doctor at one visit does not warrant a disturbance of the ALJ's decision. McCray cannot merely point to records supporting Dr. Berger's opinion; he must show the absence of substantial evidence supporting the ALJ's determination. *See Sims v. Comm'r of Soc. Sec.*, 706 F. App'x 595, 604 (11th Cir. 2017)

---

[5] As mentioned above, the ALJ found Dr. Stewart's opinion to be consistent with Dr. Gam's opinion, and she accounted for Dr. Gam's opinion in the RFC. R. 1418. The RFC states in part that McCray cannot perform work at a production pace; he can make simple work-related decisions; he can only occasionally interact with supervisors and co-workers but never in a tandem or team setting; he can only occasionally interact with the public superficially; and he can work in a setting with fixed and predictable tasks. R. 1411.

("Under a substantial evidence standard of review, [claimant] must do more than point to evidence in the record that supports her position; she must show the absence of substantial evidence supporting the ALJ's conclusion." (citing *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991))). Here, the evidence described above, including McCray's activities, counseling and therapy records that fail to support any significant limitations, and the opinions of Drs. Gam and Stewart, constitute substantial evidence supporting the ALJ's decision to assign Dr. Berger's questionnaire little weight.

### 3.   McCray's Physical RFC

McCray next claims it is unclear how the ALJ arrived at a "surprisingly precise physical RFC" when she gave partial weight to the opinions from state agency medical consultants but conceded the evidence warranted greater restrictions. Doc. 19 at 12. Again, one state agency medical consultant limited McCray to light work (R. 60–63), but the ALJ found he was "somewhat more limited" because he can never operate foot controls and requires alternating between standing and sitting. Another state agency medical consultant limited him to medium work (R. 1500–15), but the ALJ determined that more extensive exertional, postural, and environmental limitations were warranted in the RFC. R. 1417.

Citing *Pupo v. Comm'r of Soc. Sec.*, 2021 WL 5100791 *8-9 (11th Cir. Nov. 3, 2021), McCray concedes that a medical opinion is not necessary to support an RFC but argues the absence of one is concerning when there is no specific medical or non-medical basis for the decision. *Id*. Plaintiff's argument is misplaced, as the ALJ's opinion in this case contains a detailed discussion of the medical and non-medical bases supporting the physical RFC she articulated for McCray. R. 1411–1419.

For instance, before addressing the opinion evidence, the ALJ discussed McCray's medical conditions for five pages, explaining how the evidence formed a basis for the RFC. R. 1411. She discussed McCray's testimony about his symptoms at hearings in November 2019, July 2018, and August 2020. She discussed his reported activities of fishing, playing dominoes, paying the bills, grocery shopping (R. 938), going to the gym three to four times per week (R. 1676), plans to attend high school reunion in July 2018 (R. 2029), dumbbell exercises (R. 1974), and plans to look for a supervisory employment position (R. 1413). She then concluded he would be able to able to "perform the [RFC's] exertional demands of light work with the allowance to alternate between sitting and standing" based on imaging studies of his right ankle, knees, back, and right elbow. R. 1413.

She went on to discuss McCray's cardiac problems, noting that he had a myocardial infarction in November 2016 but that his reported cardiac issues in April 2017 and July 2019 were determined to be musculoskeletal in nature. R. 1413. She discussed records relating to tenderness of the knees, right ankle, and lumbar spine but noted that he has a normal gait, sensation, range of motion, and grip strength. She explained how she considered McCray's allegations of difficulty with prolonged standing and walking and how this was accounted for in the RFC by allowing him to alternate between sitting and standing at the workstation as set forth in his residual functional capacity. R. 1414.

She then discussed how McCray's medical history with respect to his right ankle, knee, back, and right elbow resulted in the restriction that he can never operate foot controls, kneel, crawl, or climb ladders, ropes, or scaffolds and that he can only occasionally climb ramps and stairs, stoop, and crouch. She explained how the restriction

from climbing ladders ropes and scaffolds would also account for any concerns relating to severe musculoskeletal and cardiac impairments. She stated that these physical impairments mean McCray can never be exposed to unprotected heights or open, moving, mechanical parts and hazardous machinery and that his cardiac impairments mean he can never operate a motorized vehicle. For the same reasons, she found he could never be exposed to dangerous chemicals; that he can only occasionally be exposed to extreme cold, extreme heat, wetness, and humidity; and that he must avoid concentrated exposure to environmental irritants such as odors, dust, gases, and fumes. She explained how his electromyogram and nerve conduction studies showing neuropathy in the right elbow resulted in the limitation of occasional overhead reaching and exposure to vibrations. R. 1414–15.

Thus, the Court finds the ALJ supported McCray's physical RFC with specific medical and non-medical evidence, and there is no merit to the argument that the RFC lacks medical or non-medical bases.

### C.   Subjective Statements of McCray and his Wife

Lastly, McCray argues the ALJ failed to credit his subjective complaints and the statement of his wife. When a claimant attempts to prove disability based on subjective pain complaints, he must provide evidence of an underlying medical condition and either (1) objective medical evidence confirming the severity of alleged symptoms or (2) evidence establishing his medical condition could be reasonably expected to give rise to the alleged symptoms. 20 C.F.R. §§ 404.1529(a)-(b), 416.929(a)-(b); SSR 16-3p; *see, e.g., Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002). If the objective medical

evidence does not confirm the severity of the alleged symptoms but the claimant establishes an impairment that could reasonably be expected to produce his alleged symptoms, the ALJ must evaluate the intensity and persistence of the alleged symptoms and their effect on the claimant's ability to work. 20 C.F.R. §§ 404.1529(c)-(d), 416.929(c)-(d); *see, e.g., Lopez v. Comm'r of Soc. Sec. Admin.*, No. 6:19-CV-986, 2020 WL 6203876, at *6 (N.D. Ala. Oct. 22, 2020); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). When the ALJ decides not to credit a claimant's testimony of pain, the ALJ must articulate explicit and adequate reasons. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). Subjective complaint credibility is the province of the ALJ. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014).

### 1.   McCray's Subjective Complaints

McCray points specifically to his complaints that he has difficulty standing from ankle problems; has knee problems; is unable to work because of his mental impairments; has problems focusing and sleeping; has flashbacks; experienced a heart attack; could stand 15 minutes and walk up to three blocks; could sit no more than 30–45 minutes; spends three to seven hours a day lying down; drives no more than two or three times a week due to his attention span and road rage; does not like being around people; and has conflicts with his wife and children. Doc. 19 at 13. The ALJ outlined these complaints and others but found the complaints were not entirely consistent with the medical evidence, specifically discussing his daily activities; the medical records relating to his knees, feet, right elbow, heart, and right ankle, and low back; and the opinion evidence. R. 1413–19.

Having reviewed this evidence, the Court agrees. McCray's reported activities of fishing; going to the gym three or four times a week; performing dumbbell exercises; riding an exercise bike; being able to walk half a mile, carry 25 pounds in one hand, and lift 50 pounds over his head; attending his high school reunion, and looking for supervisory employment discredit his subjective complaints. These are not the activities of a claimant who is precluded from all work due to physical or mental impairments.

Further, with respect to McCray's physical complaints and as described in more detail above, although he experienced a heart attack in November 2016, more recent reported cardiac issues were found to be non-cardiac in nature. He had arthroscopic surgery on his ankle in July 2015; however, no further surgery was recommended, and his medical records document a normal gait. His medical records also document normal sensation, normal range of motion, and normal grip strength. Additionally, one state agency consultant concluded that McCray could perform the exertional demands of medium work, and one state agency consultant found that McCray could perform light work. R. 1417.

With respect to his mental impairment complaints, the ALJ discussed his PTSD diagnosis, his participation in therapy, and how the overall treatment records show few abnormal mental status findings, such as problems with memory, concentration, attention, interacting with providers, judgment, or insight. R. 1416. She discussed in detail the findings of Drs. Gam and Stewart and how the overall evidence failed to document significant abnormalities in cognition, comprehension, or memory. As a result, she found he could concentrate sufficiently in two-hour increments to apply a commonsense

understanding to carry out detailed but uninvolved instructions and deal with problems involving a few concrete variables from standardized situations.

Moreover, the ALJ stated that she considered McCray's complaints in allowing him to alternate between sitting and standing at the work station; prohibiting him from operating foot controls, kneeling, crawling, or climbing ladders, ropes, or scaffolds; limiting him to occasional climbing of ramps and stairs, stooping, and crouching; prohibiting him from exposure to unprotected heights or open, moving, or mechanical parts or hazardous machinery; prohibiting him from operating a motorized vehicle, exposure to dangerous chemicals, and environmental irritants; and limiting him to only occasional reaching overhead, exposure to vibration, and exposure to the elements. R. 1415. She considered his complaints of difficulty concentrating, hypervigilance, and history of exposure to traumatic events in finding that he cannot work at a production pace but can work in a setting with fixed and predictable tasks, and she considered his reports of exposure to traumatic events, anxiety, depressed mood, anger, irritability, dislike of crowds, and tendency to keep to himself in limiting him to occasional interaction with supervisors, co-workers, and the public.

Accordingly, based on the ALJ's discussion of McCray's activities, medical records, and the opinion evidence, the Court finds that the ALJ articulated explicit and adequate reasons for discrediting McCray's subjective complaints and that substantial evidence supports her determination.

### 2.    Third-Party Function Report of McCray's Wife

As for the July 2018 third party function report completed by McCray's wife, Plaintiff argues that it was error for the ALJ to give the statement little weight "*solely* because she 'is not an acceptable medical source, nor is she impartial.*" Doc. 19 at 17 (emphasis added). However, the ALJ also pointed out that "the overall evidence, including medical and mental status findings, does not support limitations in excess of the claimant's residual functional capacity." Thus, the ALJ did not reject the statement solely because she is neither impartial nor an acceptable medical source; she also rejected it because it is not supported by the record. The same evidence described above that discredits McCray's complaints—his activities, his medical records, and the opinion evidence—also discredit McCray's wife's statement, and the ALJ explicitly and adequately articulated these reasons in her opinion.

McCray cites several cases to support the argument concerning his wife's statement, but each case is distinguishable. For instance, McCray quotes *Brown v. Shalala*, 44 F.3d 931, 936 (11th Cir. 1995) for the proposition that "[l]ay witnesses who know a claimant well may provide an important source of evidence to demonstrate the claimant's disability." Not only is the quoted language not found in *Brown*, but that case involved a pro se claimant who had had difficulty testifying. The court recognized that a lawyer would have "realize[d] that the statement of such subjective matters by the claimant would be the kind of evidence that most required supporting testimony by family or friends." *Id*. at 936 (quoting *Clark v. Schweiker*, 652 F.2d 399, 404 (5th Cir. 1981). Here, there is no issue concerning proposed *hearing testimony* by McCray's wife, there is no indication McCray

had difficulty testifying, and he was represented by counsel at all three of his hearings. R. 25, 1441, 1557.

McCray also cites *Barthol v. Astrue*, No. CIV A 1:08CV39-CSC, 2008 WL 5273113 (M.D. Ala. Dec. 18, 2008), which involved a child social security claimant. Because the ALJ failed to discuss the mother's credibility and ignored her hearing testimony concerning the child's behavior, the court was unable to determine whether the decision was supported by substantial evidence. The instant case does not involve a child claimant whose mother testified under oath at a hearing. Additionally, even though McCray's wife's statement was not presented in the form of hearing testimony, the ALJ did not ignore it. Instead, she gave it little weight because it was not impartial, from a medical professional, or supported by the evidence.[6]

Accordingly, the Court finds that the ALJ articulated explicit and adequate reasons for discrediting McCray's wife' statements, and substantial evidence supports that determination.

---

[6] Similarly, McCray relies on two non-binding, distinguishable cases. *Smith v. Heckler*, 735 F.2d 312, 316–17 (8th Cir. 1984) (the ALJ failed to accord proper weight by ignoring uncontradicted hearing testimony by claimant's mother and aunt, as well as affidavits by three supervisors, in favor of one consultative examination by a doctor); *McArthur v. Comm'r of Soc. Sec.*, No. 3:06-CV-860 LEK/DRH, 2008 WL 4866049 (N.D.N.Y. Nov. 7, 2008) (lay witnesses testimony during the administrative hearing may be entitled to great weight if uncontradicted in the record). Again, McCray's wife did not testify during an administrative hearing, and her written statement is inconsistent with the record evidence.

**V.      CONCLUSION**

For the reasons stated above, it is ORDERED as follows:

1.      McCray's Motion for Summary Judgment (Doc. 19) is DENIED;

2.      The Commissioner's Motion for Summary Judgment (Doc. 22) is GRANTED; and

3.      The Commissioner's decision is AFFIRMED.

A final judgment will be entered separately.

DONE this 9th day of March, 2023.


                            /s/ Kelly Fitzgerald Pate
                            KELLY FITZGERALD PATE
                            UNITED STATES MAGISTRATE JUDGE